[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 30, 2008
THOMAS K. KAHN
CLERK

No. 08-11549
Non-Argument Calendar

_____

Agency Nos. A97-194-154
A97-194-155

JORGE LUIS PINTO-PACHECO,
GLADYS MARIELA ARNAEZ DE PINTO,
JOANMARY VANESSA PINTO-ARNAEZ,
ANDREINA VANESSA PINTO-ARNAEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(December 30, 2008)**

Before BLACK, BARKETT and KRAVITCH, Circuit Judges.

PER CURIAM:

Jorge Luis Pinto-Pacheco, his wife, and two of their children petition this court for review of the Bureau of Immigration Appeals' (the "BIA") affirmance of the Immigration Judge's (the "IJ") decision denying their application for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and requesting relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT").[1] For the reasons stated below, we deny their petition.

## BACKGROUND

The petitioners are a Venezuelan family who entered the United States on different dates between 2000 and 2002. They lived in Miami, Florida while Pinto-Pacheo worked in the Miami recruiting office of the Venezuelan Air Force from August 2000 to October 2002. The family remained in the United States after the assignment—and their authorization to remain here—ended. They were issued notices to appear by the Department of Homeland Security, charging them with removability as aliens who remained in the United States for a time longer than permitted, pursuant to 8 U.S.C. § 1227(a)(1)(B). Pinto-Pacheco filed an application for asylum and withholding of removal under the INA and CAT in

---

[1] Petitioners failed to raise any arguments in their brief concerning the denial of CAT relief; they have therefore abandoned that issue. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005). Thus this opinion does not discuss matters relevant to the CAT claim.

April 2003, naming his wife and two daughters as derivative beneficiaries.[2]

In his application, Pinto-Pacheco asserted that he sought asylum and withholding of removal based on his political opinion and membership in a particular social group; he stated he was a member of a group of Venezuelan military personnel protesting the presidency of Hugo Chavez. Because of his involvement with this group, Pinto-Pacheco and his family had received death threats and he had been beaten by two Venezuelan groups, the Bolivarian Circles and the National Guard. He feared returning to Venezuela because he had participated in the military group's protest against Chavez at the Plaza Altamira, a public square in Caracas and had been identified as an enemy of the Chavez government. He feared that he and his family would be persecuted, and possibly killed or tortured, if they returned to Venezuela.

In support of his application, Pinto-Pacheco submitted several documents, including a December 2002 article from El Nuevo Herald newspaper describing his participation in the Plaza Altamira protest and stating, "[Pinto-Pacheco's] request for asylum was made directly by his wife . . . who . . . presented to lawyers a video and documents as proof of the political persecution of which her husband

---

[2] His daughter Andreina turned 21 during the immigration court proceedings and consequently filed her own application for asylum and withholding of removal. Her application repeated the allegations contained in her father's application.

is a victim." The article stated that Pinto-Pacheco participated in the protest, feared arrest by the army or a strike against the protestors by the Bolivarian Circles. The article also reported that Pinto-Pacheco had told his superiors he disagreed with Chavez and had resigned from the military. Other articles described the deaths of three Venezuelan soldiers who had protested the Chavez government, the arrest of a dissident general, and the "massacre of citizens" in December 2002 at the Plaza Altamira. A 2002 letter from the Venezuelan Department of Defense to Pinto-Pacheco requested he return the service passports issued to the petitioners because Pinto-Pacheco violated administrative procedures by failing to return the passports after his mission abroad was completed. Pinto-Pacheco also submitted a printout of an internet list of military personnel announcing their formal resistance to Chavez. Pinto-Pacheco's name and picture appear on the list. A 2003 Human Rights Watch document demanded that Chavez's government investigate the abductions and murders of four opposition supporters—three of whom had participated in the Plaza Altamira protest.

Pinto-Pacheco's written statement identified him as a member of the Venezuela Armed Forces for twenty-four years and stated that he declared his opposition to Chavez's government on December 14, 2002. After participating in the Plaza Altamira protest from December to February, he returned to the United

4

States because his life was in danger and Chavez had threatened to detain all military engaged in disobedience at Plaza Altamira. He asserted that Plaza Altamira was threatened by the Bolivarian Circles on several occasions "in which we were attacked with gun shots and stones." He accused Chavez-hired assassins of killing three people at the plaza and stated that one person arrested for the killings was being protected. The record also contained the U.S. State Department's Venezuela Country Report on Human Rights Practices for 2005, which noted the ongoing existence of harassment, official intimidation, and attacks on political opposition members. The report stated that the government and its agents were not suspected of politically motivated killings, but that security forces committed unlawful killings and were responsible for approximately 6,000 deaths over the previous 5 years. It also noted that "[u]nlike in the previous year, no deaths resulted from security force intervention in antigovernment demonstrations."

An asylum officer's report, prepared after an interview with Pinto-Pacheco, stated that Pinto-Pacheco feared he would be harmed by the government and the Bolivarian Circles because of his political opinion. He testified that he had been apolitical and not a member of any political organization until he returned to Venezuela in October 2002 after his job in the United States ended. Because he

5

disagreed with Chavez's leadership, he protested at Plaza Altamira from December 2002 until February 2003, when he returned to Miami. He stated that he was never physically harmed, but that National Guard and Bolivarian Circles members threatened him and sought to use violence to disperse the Plaza Altamira protestors. The asylum officer found Pinto-Pacheco's testimony not credible because it was "internally inconsistent." The officer noted that Pinto-Pacheco orally testified that he was not physically harmed in Venezuela and explained that when he wrote in his application that he was "beaten," he meant beaten mentally, not physically. He testified that he and his family were not threatened, despite having stated in his written application that they received death threats in Venezuela. Additionally, he stated that he was retired from the military by the government, in contrast to the news article reporting that he had resigned and announced his disagreement with Chavez to his superiors. Pinto-Pacheco also stated that he returned to Venezuela in October 2002 to find housing for his family, but the asylum officer concluded that the purpose of that trip was to find a way to stay lawfully in the United States.

At the removal hearing before the IJ, Pinto-Pacheco testified that he left the United States in November 2002 to find housing and schools in Caracas, and that he and his family did not intend to stay permanently in the United States prior to

that time.  He re-entered the United States in February 2003 and applied for asylum because his life was in danger in Venezuela.  He was not a member of any political organization before 2002 or 2003.  He rebelled against the Chavez government by participating, along with "hundreds of people," in the protest at the Plaza Altamira, during which the protestors were "battered, ambushed" by government supporters, many protestors were arrested, and a rock hit his hand. He also testified that he was threatened by members of the military while he was demonstrating and via calls to his cellular telephone.  He stated that he was discharged from the military.  He also testified that his wife was threatened by a "commission" of Venezuelans in Miami, who went to their house to get their passports and "did many threats [and] told her you are the wife of a traitor."  He stated that he would be killed if he returned to Venezuela.

On cross-examination, Pinto-Pacheco testified he did not contact his father or siblings, who resided in Venezuela, for help with his family's relocation; he looked for an apartment there for a month, but could not find one because they were too expensive; and he found two schools, but did not enroll his children because he was waiting for their documents.  He was asked about unused airline tickets in his family members' names to return to Venezuela on October 27, 2002 and explained that he had received permission from the Venezuelan government

for his family to remain in the United States for an additional six months and that their airline tickets were "open" tickets. The family did not leave the United States in October as required because his daughters had to stay in school. He acknowledged that he learned in August 2002 that his job in the United States would be ending in October. He testified that he decided in November—before joining the Altamira protest—that "at the moment" his family should stay in the U.S. because of the upheaval and "constant political problems" in Venezuela, including businesses not operating. Pinto-Pacheco stated that the rock incident was the only physical harm he suffered, but also testified that he was physically attacked during ambushes by Chavez supporters. He said he began fearing for his life in January and made the decision to seek asylum in February. He also testified that his wife was interested in filing an asylum claim as early as December 2002, when she was interviewed by El Nuevo Herald for the article. He also explained that he did not tell the asylum officer about the rock incident because it was too difficult to do so through the translator.[3] He testified that he was discharged from the military and acknowledged that he received a pension, but was "fighting that pension" with the government. At one point during the hearing, the IJ noted on

---

[3] Neither he nor the translator mentioned having difficulty communicating to the officer at the time.

8

the record that Pinto-Pacheco was not directly answering questions.

The IJ denied the petitioners' application for asylum, withholding of removal, and CAT relief, and ordered them removed to Venezuela. The IJ found that the acts in question—receiving threatening telephone calls and being hit on the wrist by a rock during a mass demonstration—did not rise to the level of persecution. The IJ also noted that in response to Pinto-Pacheco's participation in the Plaza Altamira protest, the "government has responded by politely asking for the military passports back, retiring him and sending him a monthly pension."

Additionally, the IJ found that Pinto-Pacheco was not credible, based on his non-responsiveness and the "massive inconsistences" between his application, his asylum interview, and his hearing testimony. Specifically, the IJ found that Pinto-Pacheco told the asylum officer he had been beaten, yet testified during the hearing that his only physical mistreatment was a rock thrown by an unknown person that hit his wrist. The IJ acknowledged Pinto-Pacheco's argument that interpretation problems existed during the asylum interview, but found that Pinto-Pacheco was able to communicate accurately with the asylum officer "all essential elements of his claim[,] including his age, where he was born, the fact that he had served in the Air Force." The IJ noted that Pinto-Pacheco disputed only one part of the interview, that dealing with whether he had resigned, retired, or was

9

discharged from the military.  The IJ also questioned Pinto-Pacheco's account of the timing of his fear of persecution, because Pinto-Pacheco testified that he feared for his life beginning in January 2003, but the El Nuevo Herald article describing his asylum application and fear was published in December of 2002.  The IJ also questioned whether Pinto-Pacheco and his family ever intended to return to Venezuela, since after learning in August 2002 that his job in the United States was ending, he nonetheless enrolled his children in a U.S. school for the fall and demonstrated a "lack of diligence in seeking living arrangements" back in Venezuela.  Also, the IJ found inconsistencies between Pinto-Pacheco's alleged fear of persecution developing in January 2003, the family's unused airline tickets from October 2002, and evidence of his wife's concern about strikes and closings of schools and businesses in Venezuela before Pinto-Pacheco participated in the Altamira protest.[4]  The IJ also found that Pinto-Pacheco's testimony included the repetition of "catch phrases" and sounded rehearsed and memorized.

The IJ further found that the documentary evidence weakened rather than supported the petitioners' claim, as it demonstrated that Pinto-Pacheco's wife and

---

[4] The IJ appears to have conflated two parts of Pinto-Pacheco's testimony here.  Pinto-Pacheco testified that his wife was interested in filing an asylum claim as early as December 2002.  He also testified that in November, when he stopped looking for housing and schools in Venezuela, he did so because of "constant strife" and businesses not operating, as well as "constant political problems[.]" But there is no reference in the transcript to his wife's concern about strikes and closings.

10

their attorney "were utilizing the news media to, in essence, build a claim for asylum." The website listing of military dissidents did not help his claim, because Pinto-Pacheco was the next-to-last person and the only non-officer on the list. The IJ concluded that Pinto-Pacheco added his photo to the website after arriving in the United States. Based on this evidence, the IJ found that it was not clear whether Pinto-Pacheco even participated in the Altamira protest. Finally, the IJ found that conditions in Venezuela had improved and incidents involving the Bolivarian Circles had decreased in recent years. Because the IJ found that Pinto-Pacheco did not qualify for asylum, he also denied withholding of removal.

On appeal, the BIA dismissed the petitioners' appeal from the IJ's denial of their claims. The BIA found that the IJ did not clearly err when it determined that Pinto-Pacheco was not credible, based on his demeanor and the inconsistencies between his written application, asylum interview, and testimony as to whether and what type of harm he suffered in Venezuela, when and why he feared for his life, and whether he and his family intended to return to Venezuela. The notice of appeal failed to explain the inconsistencies identified by the IJ. Second, the BIA found that the petitioners failed to satisfy their burden of proof for asylum, because being hit on the wrist by a rock did not rise to the level of past persecution and Pinto-Pacheco's testimony that he did not know if the Venezuelan government

11

was seeking him did not support a finding of a well-founded fear of future persecution. Finally, the BIA found that because the petitioners had not met their burden of proof for asylum, they also did not qualify for withholding of removal.

## STANDARD OF REVIEW

We "review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion. Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citations omitted). Here, the BIA issued its own opinion and also adopted some of the IJ's reasoning. We therefore review the decisions of both the IJ and the BIA in this case.

We review de novo legal determinations of the IJ and BIA. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). Factual determinations, however, are reviewed under the substantial-evidence test, which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc). We must affirm the BIA's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." D-Muhumed, 388 F.3d at 818 (quotation omitted). "To reverse the . . . fact findings, we must find that the record not only

12

supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

## DISCUSSION

An alien present in the United States may apply for asylum under 8 U.S.C. § 1158(a)(1). The Attorney General or Secretary of the Department of Homeland Security has discretion to grant asylum if the alien meets the statutory definition of a "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. 8 C.F.R. § 208.13(a); Al Najjar, 257 F.3d at 1284. To establish eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a well-founded fear that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a) and (b); Al Najjar, 257 F.3d at 1287. Furthermore, "persecution is an extreme concept, requiring more than a few isolated incidents of verbal

13

harassment or intimidation, and . . . mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (quotations and alteration omitted).

To establish a well-founded fear of persecution, the applicant must show that there is a "reasonable possibility" of suffering persecution if he returns to his home country. Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007). The fear of persecution must be "subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. The alien must show a nexus between a statutorily protected ground and the feared persecution, and he can do so by presenting "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" the statutorily listed factor. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation omitted). The alien does not, however, need to prove that he would be "singled out" for persecution if (1) there is a "pattern or practice" of persecution against similarly situated individuals and (2) his or her inclusion within that group of individuals makes fear of persecution reasonable. See 8 C.F.R. § 208.13(b)(2)(iii).

An adverse credibility determination alone may be sufficient to support denial of an asylum application. D-Muhumed, 388 F.3d at 819. The IJ, however, must still consider all of the evidence introduced by the applicant. Forgue, 401 F.3d at 1287. The IJ must also offer specific, cogent reasons for an adverse

14

credibility finding. D-Muhumed, 388 F.3d at 819. Once an adverse credibility finding is made, the burden is on the alien to show that the credibility decision was not supported by "specific, cogent reasons" or was not based on substantial evidence. A credibility determination, like any fact finding, is reviewed under the substantial-evidence test and "may not be overturned unless the record compels it." Id. Finally, "we may not substitute our judgment for that of the fact-finder with respect to credibility findings." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005).

Considering these factors, substantial evidence supports the IJ's and the BIA's conclusions that Pinto-Pacheco's testimony was not credible. In particular, Pinto-Pacheco's accounts of whether and what type of physical harm he suffered varied widely, from "beaten" and "attacked with gun shots and stones" in his written application, to beaten mentally but suffering no physical harm in his interview with the asylum officer, to being hit on the hand with a rock in his testimony at the IJ hearing. Also, the El Nuevo Herald article, discussing Pinto-Pacheco's asylum claim, was published on December 18—just four days after he joined the Plaza Altamira protest and a month before, according to his testimony, his fear of living in Venezuela even developed. His testimony about the circumstances of his departure from the Venezuelan military—whether he

15

resigned, retired, or was forced out—was also inconsistent, and his statement about "fighting" the government for his pension was unsupported by corroborating evidence.  Pinto-Pacheco's argument that translation errors affected his testimony and were responsible for some of the inconsistencies also fails because he faults only the translations during his asylum interview and does not address the inconsistencies between his written application and his testimony before the IJ.  He also failed to specify which translations were incorrect or provide details to support this argument.  Additionally, almost two months before Pinto-Pacheco joined the Plaza Altamira protest, his family chose to overstay their visas in the United States rather than use the airplane tickets already in their possession.  This fact, coupled with their lack of preparation for a return to Venezuela, supports the IJ's conclusion that Pinto-Pacheco and his family intended to remain in the United States even before his participation in the protest that allegedly created his fear of persecution, and, therefore, that his current assertions of fear are less than genuine.

This court will not substitute its judgment for that of the fact-finder with respect to credibility findings, Yang, 418 F.3d at 1201, and here Pinto-Pacheco failed to show that the BIA's credibility decision was not supported by "specific, cogent reasons" or was not based on substantial evidence.  D-Muhumed, 388 F.3d at 819.  Thus, we conclude that substantial evidence supports the IJ's and the

16

BIA's determinations that Pinto-Pacheco was not credible in his assertions that he experienced past persecution.

Although an adverse credibility determination alone may be sufficient to support denial of an asylum application, we note that Pinto-Pacheco also failed to meet his burden of proving a well-founded fear of future persecution by failing to establish either past persecution or a good reason to fear future persecution. D-Muhumed, 388 F.3d at 819; 8 C.F.R. § 208.13(a) and (b); Al Najjar, 257 F.3d at 1284, 1287, 1289. Substantial evidence supports the findings of the IJ and BIA that Pinto-Pacheco failed to show past persecution because "persecution is an extreme concept." Sepulveda, 401 F.3d at 1231 (quotation omitted) (holding that menacing phone calls and threats made to alien, her brother, and members of group to which alien belonged were not past persecution). The allegations Pinto-Pacheco relies upon consisted of threatening telephone calls, threats made to his wife in the United States, a rock thrown by an unknown assailant that hit his wrist, and attacks on the group of protestors at the Plaza Altamira. This conduct does not rise to the level of persecution and certainly does not compel this court to conclude that he suffered past persecution, particularly in light of his inconsistent testimony about the threats and whether he suffered any physical attacks.

Second, substantial evidence supports the findings of the IJ and the BIA that

17

Pinto-Pacheco failed to demonstrate a well-founded fear of future persecution. The evidence suggests that petitioners decided to stay in the United States before Pinto-Pacheco allegedly participated in the Plaza Altamira protest and informed his superiors that he wished to resign in protest against Chavez's presidency: his family did not use airplane tickets to return home in October 2002, Pinto-Pacheco made minimal efforts to relocate there despite the termination of his U.S. assignment, and the El Nuevo Herald article discussed his fear of living in Venezuela at a time before his oral testimony indicated he developed this fear. This evidence casts doubt on the subjective genuineness of his fear.

Substantial evidence also supports the finding that his fear was not objectively reasonable. Pinto-Pacheco did not suffer past persecution, as discussed above, and the only bases for his claim of fear of future persecution were his inconsistent testimony and the Country Report, which concededly noted the existence of ongoing harassment, intimidation, and attacks on political opposition members. The Country Report alone is not sufficient to demonstrate future persecution absent evidence that Pinto-Pacheco would be singled out. See Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1259 (11th Cir. 2006) (holding that substantial evidence supported the IJ's determination that petitioners were not eligible for asylum or withholding of removal, despite the Country Report's

18

recognition of widespread violence, because petitioners failed to prove they would be singled out). Nor did Pinto-Pacheco present evidence of a "pattern or practice" of persecution against military dissidents which would support his fear of future persecution despite a lack of evidence that he would be singled out. 8 C.F.R. § 208.13(b)(2)(iii). Pinto-Pacheco offered only an internet listing of military resisters to Chavez without evidence that those individuals are being targeted or persecuted. Pinto-Pachedo presented articles discussing the deaths of protestors during the protest at Plaza Altamira but offered no evidence that participants had continued to be persecuted after leaving the protest. Thus, Pinto-Pacheco did not meet his burden of showing refugee status on the basis of a well-founded fear of future persecution.

Finally, to qualify for withholding of removal, an alien must establish standards more stringent that those for asylum eligibility. Because Pinto-Pacheco could not establish eligibility for asylum relief, he necessarily failed to demonstrate that it was "more likely than not" that he would be persecuted in Venezuela, which is the standard applicable to a withholding of removal claim. Sepulveda, 401 F.3d at 1232

## CONCLUSION

For the foregoing reasons, we find no reversible error. Accordingly, we deny the petitioners' petition for review.

**PETITION DENIED.**